## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**BARBARA WRENTZ**                                                    **PLAINTIFFS**
**and KIA PHILIP**

**v.**                              **CASE NO. 4:23-CV-00014-BSM**

**USABLE LIFE**                                                        **DEFENDANT**

### <u>ORDER</u>

USAble Life's motions for summary judgment [Doc. Nos. 13 & 15] are granted, and

the complaint of Barbara Wrentz and Kia Philip is dismissed with prejudice.

### I. BACKGROUND

Wrentz and Philip are former USAble employees who are suing USAble for

employment discrimination.

A.    <u>Barbara Wrentz</u>

USAble, an insurance company, hired Wrentz, a white female, in December 2008 to

be a full-time administrative assistant.  Deposition of Barbara Wrentz ("Wrentz Dep.")

11:15–22, 12:6–11 (internal pagination), Doc. Nos. 14-3 & 19-2.  Within a year, Wrentz was

promoted to supervisor of administrative and office services.  *Id.* at 12:20–13:3.  Three years

later, Wrentz was again promoted to manager of administrative and office services.  *Id.* at

14:3–6.  On March 6, 2020, Wrentz voluntarily transitioned to working part-time in

anticipation of her upcoming retirement.  *Id.* at 15:20–17:7.  She contends that she was

subjected to disparate treatment and adverse employment actions between the time she

transitioned to part-time work and her retirement on December 31, 2021.  Pl. Wrentz's Resp.

Def.'s Mot. Summ. J. on Barbara Wrentz's Compl. 1, Doc. No. 19 ("Wrentz MSJ Resp.").

Wrentz's first contention is that, on December 9, 2020, USAble held three all-hands Zoom meetings.  Wrentz Dep. 46:1–24, 50:6–10; Wrentz Disc. Resps. 1, Doc. No. 19-3. Wrentz attended the third all-hands meeting, during which CEO Jim Casey performed a skit in which he acted as a meteorologist reporting on the snowing weather while COO Rich Macy acted as a newscaster at a news desk.  Wrentz Dep. 46:7–16, 18–19.  Casey joked, "It is awfully cold out here.  It is so cold that Barbara Wrentz's buns are frozen.  And we all know that she makes good cake balls." *Id.* at 45:20–46:1.  Wrentz learned that the joke was also made in the two earlier meetings.  *Id.* at 51:20–25.

After the meetings, Wrentz's coworkers expressed sympathy for her and asked if she had approved the joke.  *Id.* at 51:22–52:2.  Wrentz had no knowledge of the joke before it was made and felt violated and hurt that the joke was made without her permission.  She was also horrified, shocked, and humiliated.  *Id.* at 47:2–4, 48:3–4, 48:17–19; Wrentz Disc. Resps. 4.  Wrentz did not complain about the joke because she was too embarrassed to complain.  Wrentz Dep. 52:3–8.  Wrentz had a good relationship with Casey and other than this incident, she had no negative experiences with him.  *Id.* at 47:13–15, 48:8–12, 55:17–19.

Her second contention relates to a virtual presentation regarding the COVID vaccine that was presented to USAble employees by two black female doctors on September 29, 2021.  *Id.* at 57:10–15, 57:20–58:3, 59:13–25; Deposition of Kia Philip ("Philip Dep.") 118:9–23 (internal pagination), Doc. Nos. 14-4, 16-3 & 20-3.  One of the slides shown in the presentation was a cartoon depicting a heavyset white man with a beer and a cheeseburger

2

stating, "Heck, no!  I ain't getting no vaccine."  Wrentz Dep. 58:21–59:5, Wrentz Dep. Ex. 6.  After the presentation, the slide-show was made available to USAble's employees.  *Id.* at 60:13–18.

On October 4, 2021, Wrentz complained about the cartoon to Brian Black, USAble's in-house counsel.  *Id.* at 60:19–61:16, *id.* Ex. 7.  Wrentz found the cartoon to be discriminatory and an improper form of comic relief because it purportedly depicted the type of people that did not want to get the vaccine.  *Id.* at 56:10–14, *id.* Ex. 7.  In her complaint to Black, she hypothesized that if the presenters had been white and they had displayed a cartoon of "a black person with an afro, eating fried chicken, watermelon and drinking Schlitz malt liquor and saying, 'I ain't gettin no vaccine'," then the presentation would be called racist and not comic relief because data from the CDC in 2021 shows that black people were the group least likely to get the vaccine.  *Id.*

Black responded that he would convey Wrentz's concerns to the appropriate people without divulging who made the complaint.  *Id.*  Thereafter, the entire slide-show was removed from USAble's intranet so that employees could no longer view it.  *Id.* at 62:13–17.  Black did not inform anyone that it was Wrentz who complained.  Declaration of Brian Black ¶¶ 3–4, Doc. No. 14-5.  No one at USAble apologized for the cartoon, followed up with Wrentz about her complaint, or told Wrentz the slide-show had been removed from USAble's intranet.  Wrentz Dep. 63:5–25.

In late October 2021, Wrentz informed Erin Scoggins, USAble's Human Resources Director, as well as other members of management, that she would be retiring.  *Id.* at

28:11–14, 33:8–14.  Wrentz voluntarily continued to work until the end of the year.  *Id.* at

30:13–17.  Wrentz says her primary reason for retiring was the joke made by Casey.  *Id.* at

83:3–7.  Another reason was that USAble implemented a mandatory COVID vaccination

policy requiring all employees to receive a vaccination, request and receive an exemption,

or resign by December 31, 2021.  *Id.* at 82:5–25, 83:1–13.  Wrentz did not want to be

vaccinated; however, USAble asked her to file for a religious exemption, and she believes

she would have maintained her employment had she done so.  *Id.* at 83:13–20.

On October 22, 2021, Wrentz informed Brenda Scott in human resources that she had

tested positive for COVID.  *Id.* at 65:5–8, 66:25–67:3.  Scott informed Wrentz that she could

return to work in person fourteen days later according to USAble's COVID guidelines.  *Id.*

at 65:12–14; Pl. Wrentz's Resp. Def.'s Statement of Undisputed Material Facts ¶¶ 3–4, Doc.

No. 19-1 ("Wrentz SOF Resp.").  Human resources advised Wrentz to remain at home a

minimum of fourteen days from the appearance of her symptoms and at least three days after

recovery, which it defined as "fever-free without fever-reducing medications and

improvement in any respiratory symptoms."  Wrentz Disc. Produc. 2, Doc. No. 19-4.

Despite Scott's instruction, Wrentz came to work in person on November 1, 2021, to

drop off food for Ed Murphy, a member of the USAble management team.  Wrentz Dep.

33:10–11, 67:20–68:5.  Wrentz entered the lobby and dropped off the food for Murphy at the

receiving dock.  *Id.* at 75:21–25, 76:1–4.  The following day, Wrentz again came to work in

person.  *Id.* at 68:6–7.  Wrentz waited in the lobby to check in with Scoggins as Wrentz had

not seen her in some time.  *Id.* at 68:11–18.  Scoggins saw Wrentz in the lobby and told her

4

that she could not be at work because she had not received a doctor's note clearing her to return to work. *Id.* at 68:19–69:6.

After her conversation with Scoggins, Wrentz asked her doctor to provide a note clearing her to return to work. *Id.* at 71:14–20. Wrentz received a note showing she was released to return to regular work effective November 1, 2021. Wrentz Disc. Produc. 1. In addition to providing this note to USAble, Wrentz produced a timeline showing that she had waited fifteen days from the appearance of symptoms and three days from her recovery, as required by USAble's guidelines. *Id.* at 2.

On November 16, 2021, Wrentz was issued a final written warning from her supervisor David Prickett for: (1) violating USAble's COVID quarantine policy by returning to work on November 1 and 2, prior to her November 5 return date; (2) failing to properly wear her mask and social distance while at work; (3) falsely telling USAble that she only came to the office on November 2; and (4) failing to provide a complete list of everyone she came into contact with on November 1 and 2. Wrentz Dep. 20:11–22, 73:5–8, 73:23–74:4; Wrentz Dep. Ex. 8. The final written warning provided that Wrentz would be subjected to a 50% reduction of her incentive bonus. *Id.* at 94:6–11, *id.* Ex. 8.

Wrentz alleges that this warning is retaliation for her complaint about the cartoon. Wrentz MSJ Resp. 1. Wrentz alleges that the statements in the warning are pretext because other USAble employees were permitted to enter the office and to ride the elevator without masks. Wrentz Disc. Resps. 1–2; Wrentz Dep. 79:8–25, Ex. 5 ¶ 32.

Wrentz's employment ended on December 31, 2021. Wrentz Dep. 15:10–12,

19:19–20:4.  USAble contends that Wrentz voluntarily retired while Wrentz contends that she was constructively discharged.  Wrentz SOF Resp. ¶ 39.  When Wrentz received only half of her yearly bonus, she met with the human resources director in March 2022, who told her that she was not entitled to the full bonus due to her written warning.  Wrentz Dep. 81:14–24, 94:1–13; Wrentz Dep. Ex. 8.

Wrentz submitted an initial inquiry with the EEOC on June 27, 2022, and filed a formal charge of discrimination on October 13, 2022.  *Id.* at 84:17–85:2; *id.* Ex. 9; Wrentz EEOC Email, Doc. No. 19-5.  The EEOC dismissed the charge and issued a right to sue letter, concluding that the charge was not timely filed.  Wrentz Dep. 84:17–85:2.  Wrentz filed suit on January 6, 2023, asserting sex discrimination and retaliation under Title VII and the Arkansas Civil Rights Act (ACRA).  USAble is moving for summary judgment on all claims.

B.    Kia Philip

Philip, a black female, was hired by USAble as an Executive Support Analyst beginning on December 17, 2015.  Philip Dep. 14:3–7, 105:7–8; Philip Dep. Ex. 1.  Her job description states that her role was to perform "administrative and analytical duties supporting the Senior Vice President National Group Sales and the Executive Vice President Management & Development."  *Id.* Ex. 2.  The position included analyzing data, creating presentations and reports, managing schedules, constructing agendas, scheduling business travel and accommodations, and serving as backup support to other executives when needed.  *Id.* at 69:13–17, *id.* Ex. 2.  Philip reported directly to Senior Vice President Chris Calos and

6

Executive Vice President Julie Marshall. *Id.* at 16:18–19:1. Marshall was responsible for assigning work to Philip. *Id.* at 46:9–13. Philip had a good working relationship with Marshall, who was responsible for evaluating Philip's performance and determining if she was eligible for raises. *Id.* at 17:24–18:2, 22:11–13. Philip received a raise every year based on Marshall's evaluations. *Id.* at 22:6–10, 23:25–24:2; *id.* Ex. 3.

On June 2, 2017, Philip requested guidance from HR regarding handling her workload after an employee in her department left and newly-hired Vice President of Marketing Andrew Hottell began delegating work to her. *Id.* at 27:12–24, 29:24–30:17, 31:6–7; *id.* Ex. 4. Philip contends that she was only required to support C-Suite level management and not Hottell, despite the fact that her job description stated that she was to serve as "back up support to other executives when needed." *Id.* at 47:2–5, *id.* Ex. 2. At this time, Hottell was a Vice President and he was not promoted to Senior Vice President until 2021. Def.'s Answers Pl.'s First Set Interrogs. 2, Doc. No. 20-2. How USAble defined the term "executive" is unclear.

That same day, Philip also complained to HR that Hottell referred to Marshall as "Dragon Lady" and would address Philip on occasion "[i]n a mocking manner of a perceived notion of how African American women talk" by "popping his fingers, and moving his head, and changing his voice to mock and mimic an African American woman." Philip Dep. 32:1–33:16, 34:5–8, 36:1–3. Philip testified that Hottell's mannerisms were specifically intended to mock and mimic a "low class, uneducated" black woman, similar to how television and movies portray "poor black women in the hood/ghetto speaking to each other."

7

*Id.* at 33:3–6, 33:13–16.  HR advised Philip to speak with Marshall regarding her workload, including her work on tasks delegated to her by Hottell.  *Id.* Ex. 4.  HR specifically advised Philip to make Marshall aware that Hottell was delegating work to her and to find out if she should be supporting him.  *Id.*  HR did not document any actions taken in response to Hottell's perceived mocking of black women.  *Id.*

On September 28, 2017, Philip contacted HR regarding Hottell's continued delegation of work to her.  *Id.* at 37:6–9, *id.* Ex. 4.  Philip specifically complained that Hottell had started delegating work to her again while Marshall was on leave, and that Philip was not Hottell's assistant.  *Id.* Ex. 4.  Philip pointed out that Hottell had already been told not to delegate administrative and support tasks to her, and yet he continued to do so.  *Id.* at 37:10–22.  Marshall was told by Jane-Alyse VonOhlen to speak with Hottell regarding how to support his workload.  *Id.* Ex. 4.

Philip later complained to VonOhlen that Hottell was harassing her by continuing to delegate work to her.  *Id.* at 38:24–39:22, 44:17–45:5.  Philip also complained that Hottell made multiple comments to her that her wig looked better than her natural hair.  *Id.* at 40:4–10, 44:2–5.  VanOhlen told Philip that these were serious complaints and that she would look into them.  Pl. Philip's Resps. Def. USAble Life's First Set Interrogs. & Reqs. Produc. 2, Doc. No. 20-4 ("Philip Disc. Resps.").  A few weeks later, VanOhlen was no longer working for USAble.  *Id.*

On May 9, 2018, Philip again complained to HR that she was wasting time by consistently working on projects that were never used.  Philip Dep. 49:7–15; Philip Dep. Ex.

4.  Her complaint related only to assignments and action items that were assigned by Hottell. *Id.* at 50:9–25.  Philip also complained that Hottell asked her to book business travel for him. *Id.* Ex. 4.  Although Philip's job description included scheduling business travel and accommodations, Philip objected to booking travel for Hottell because he was not a C-Suite executive.  *Id.* at 51:24–52:15, *id.* Ex. 2.

In April 2019, Philip requested to meet with HR regarding her job description because she was being asked to perform administrative work for other people.  *Id.* at 53:25–55:3.  HR advised Philip that her job description did include administrative functions and that it was not outside the normal for Hottell to request Philip to schedule if Marshall was also attending the meeting.  *Id.* Ex. 4.  Philip was advised to speak with Marshall in the future before responding to requests from Hottell.  *Id.* at 64:9–15, 64:20–65:2; *id.* Ex. 4.

In July 2019, Philip asked to meet with HR because she felt she was being asked to perform duties outside her job description.  *Id.* at 71:2–4, *id.* Ex. 3.  Philip complained that she was doing reports that were not within the scope of her job description, that this, and similar projects, were specifically assigned to her by Hottell, and that it was his responsibility to complete the reports.  *Id.* at 71:8–18, *id.* Ex. 4.  Philip also complained that Hottell took credit for an award-winning incentive trip project which involved, among other things, a website and mobile app that Philip helped create.  *Id.* at 72:5–75:19, *id.* Ex. 4.  After receiving the award, Hottell gave trophies to all of his team members, including team members who did not work on the project, but he gave no recognition to Philip.  *Id.* at 76:13–21.  Philip does not know if the award was given to Hottell personally or if he

accepted the award on behalf of USAble's marketing department.  *Id.* at 80:21–81:5.

After complaining about USAble's failure to recognize her work, Philip received an Excellence in Action Award for her contributions, along with a $500 prize.  *Id.* at 81:23–82:1, 82:9–83:24; *id.* Ex. 6.  The award states that the incentive trip mobile app development "was a project [Philip] embarked on by herself (and unprompted)."  *Id.* Ex. 6. In a July 29, 2019 email expressing gratitude for her receipt of the award, Philip stated in part to Marshall that she "wanted to do the mobile app," "wanted to be sure that [she] could help support [USAble's] mission and goals," "want[s] to be a reflection of [Marshall] and [her] core values," and that she "will continue to work hard."  *Id.*

At some point during the COVID pandemic in 2020, Philip stopped speaking to, and working with, Hottell.  *Id.* at 97:16–98:16.  Philip was not disciplined for her refusal to work with Hottell.  *Id.* at 101:12–14.

In November 2021, Philip complained to HR about Hottell's handling of the administrative support for Senior Vice President Steve Valenti.  *Id.* at 92:1–14, 93:8–16, 98:17–23; *id.* Ex. 4.  Although Hottell never made a representation or had any conversation with Philip about providing support for Valenti, other employees had forwarded concerns to Philip about Valenti having no administrative support coverage, and Philip wanted HR to know that Hottell was saying things that were not true—*i.e.*, that Valenti was covered when he in fact was not.  *Id.* at 96:1–97:15, 98:24–99:6.  HR reiterated that Philip would not be performing any work for Hottell.  *Id.* Ex. 4.  Philip also complained that Hottell continued to take credit for others' work and was untrustworthy, difficult to work with, bullying, rude

to people he could take advantage of, and insulting to female employees.  *Id.* at 100:4–24, 103:25–104:7; *id.* Ex. 4; *see* Philip Disc. Resps. 1–5.  HR did not document any actions taken in regard to Hottell's behavior outside of its statement that Philip would not be performing any work for Hottell.  Philip Dep. Ex. 4.

Philip also complained to HR that Hottell "put his hands" on another employee, Josh Weaver.  *Id.* at 108:9–109:3.  HR never documented this complaint, and to Philip's knowledge, never took any action to rectify the situation.  *Id.*  Soon after, Weaver left his job with USAble.  *Id.*

On February 21, 2022, Philip contacted Michelle Harding, Chief Legal Officer and Head of HR, after Philip and some other employees picked up the work of two marketing employees who left USAble.  *Id.* at 104:20–107:10.  Philip hoped that Harding, a black woman, would assist her in resolving the issue with Hottell indirectly assigning work to her through others in the marketing department.  *Id.*  Although Hottell had a fully-staffed team working for him, Philip had been performing work for marketing since the incentive trip in 2019.  *Id.*  Although Philip does not know how the former employees' work was distributed, she believes she received a disproportionate amount of the work because of her race and sex. *Id.* at 121:6–122:9.

On April 4, 2022, Philip met with Marshall to discuss her employment.  *Id.* at 129:2–4.  Marshall noted that Philip seemed unhappy at USAble  and offered to help her find another job.  *Id.* at 129:4–12.  Philip could tell from Marshall's tone that it was best for her to try and find another job.  *Id.* at 129:22–23.  Philip had already sought other employment

and had received an offer from LiveRamp, a technology company. *Id.* at 112:8–11, *id.* Ex. 10.   After speaking with Marshall, Philip emailed Marshall, Harding, and Scoggins announcing that she would resign on April 15, 2022. *Id.* at 21:6–8, 109:4–23; *id.* Ex. 9. Meanwhile, Philip signed her offer of employment from LiveRamp, who offered a comparable salary. *Id.* at 112:8–11, 112:25–113:15; *id.* Ex. 10; Philip Disc. Resps. 9.

After Philip's resignation, Marshall emailed a coworker, Beth Burwell, a Senior Vice President of Operations, to tell Burwell that Philip was resigning.  Marshall & Burwell Emails, Doc. No. 20-6.  Marshall admitted that Philip's resignation was expected. *Id.* Marshall wrote that Philip was resigning because she "harbors too many hurt feelings that go back to" Hottell and that this was "something none of us can fix." *Id.*  Burwell responded that "nothing was done about" the issues Philip reported with Hottell, and Marshall agreed, writing that Philip kept witnessing similar incidents and reiterating that she told Philip that she could not change things. *Id.*

After filing a timely charge of discrimination with the EEOC and receiving a right to sue letter, Philip filed suit against USAble asserting sex and race discrimination and retaliation under Title VII and the ACRA. USAble is moving for summary judgment on all claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  Once the moving party

12

demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in her pleadings. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute requiring a trial. *Id.* All reasonable inferences must be drawn in the light most favorable to the non-moving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). The evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

### III. DISCUSSION

USAble's motions for summary judgment are granted, and the complaint of Wrentz and Philip is dismissed with prejudice.

A.     Barbara Wrentz

Summary judgment is granted on Wrentz's sex discrimination and retaliation claims.

### *1. Timely Filing*

USAble's motion for summary judgment on Wrentz's claims due to her failure to timely file her charge of discrimination with the EEOC is denied, and her claims will be addressed on the merits. *See Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 475–76 (8th Cir. 2010) (an untimely Title VII sex discrimination claim also time-bars an ACRA sex discrimination claim). *But see Smith v. ConAgra Foods*, 431 S.W.3d 200, 203 (Ark. 2013) (ACRA has a three-year statute of limitations period for claims of retaliation). Although the EEOC concluded that Wrentz's claims were not timely filed, Wrentz will be given the benefit of the doubt based on a liberal construction of 42 U.S.C. section 2000e-5(e). Specifically,

Wrentz's claims will date back to the denial of her full bonus in March 2022 rather than her alleged constructive termination date of December 31, 2021. *See* 42 U.S.C. § 2000e-5(e)(3)(A) ("an unlawful employment practice occurs . . . when a discriminatory compensation decision or other practice is adopted"). Moreover, the date for Wrentz's request for the EEOC to take remedial action is determined to be the day she sent her first email on June 27, 2022, rather than the day she filed her formal charge on October 13, 2022. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("[I]f a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise to settle a dispute between the employer and the employee."); *see also* Wrentz EEOC Email (acknowledging receipt of Wrentz's inquiry on June 27, 2022, and scheduling a phone interview for September 22, 2022). Thus, the time period of March to late June is within the required 180-day timeline. *See* 42 U.S.C. § 2000e-5(e)(1). Consequently, all of Wrentz's claims are addressed on the merits.

### 2. Sex Discrimination

Summary judgment is granted on Wrentz's sex discrimination claims because she has neither presented direct evidence nor created an inference of sex discrimination. *See Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (sex discrimination claims under Title VII and ACRA governed by same standards).

### a.   Direct Evidence

Wrentz has provided no direct evidence of sex discrimination. First, the comment about her buns in December 2020 is not direct evidence of a December 2021 constructive

discharge because of the lapse in time.  *See Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152–53 (8th Cir. 2007) (four-month lapse between comments reflective of prejudice and employee's termination undercut a finding of direct evidence of discrimination).  Second, Wrentz's November 2021 final written warning is not direct evidence of a December 2021 constructive discharge because it does not "clearly point[] to the presence of an illegal motive." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).  Indeed, Wrentz admits that she was in violation of USAble's policies and guidelines.  Rather, her claim is premised on the idea that USAble failed "to issue the same to other employees who violated the same policy."  Wrentz MSJ Resp. 2.

        b.     Burden-Shifting Framework

      Although she lacks direct evidence, Wrentz could still survive summary judgment by creating an inference of unlawful sex discrimination under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This framework requires Wrentz to establish a prima facie case of sex discrimination.  *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1062 (8th Cir. 2020).  To meet her burden she must show that: "(1) she is a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently."  *Id.* (citation omitted).  If Wrentz establishes a prima facie case, USAble must offer evidence to show there was a legitimate, nondiscriminatory reason for its actions.  *McDonnell Douglas*, 411 U.S. at 802. If USAble articulates such a reason, the burden returns to Wrentz to show that USAble's

reason is pretextual.  *Id.*  Wrentz fails to establish a prima facie case of sex discrimination for two reasons.

First, Wrentz fails to show that she suffered an adverse employment action because the record shows that she voluntarily resigned rather than being constructively discharged. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996).  "A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable.  To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly.  An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged."  *Id.* (citations omitted).  The two actions upon which Wrentz bases her sex discrimination claims fall short of establishing the objectively intolerable working conditions necessary to establish a constructive discharge claim.  The joke about Wrentz's buns in December 2020 was an isolated comment that was "not severe, pervasive or demeaning enough to have altered a term, condition, or privilege of her employment."  *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc).  And, Wrentz did not give USAble an opportunity to address the issue because she never complained to Casey, the Human Resources Department, or anyone in management.  Wrentz Dep. 52:3–6.  Moreover, the November 16, 2021, final written warning came after Wrentz had already informed USAble of her retirement in late October

2021. Thus, even if the final written warning constitutes an intolerable working condition, the warning did not force Wrentz to quit.

Second, Wrentz has failed to show that similarly situated male employees were treated differently. Indeed, with regard to her final written warning, Wrentz has pointed to no other employee who was permitted to return to work within fourteen days of testing positive for COVID. *Id.* at 78:7–10.

Even if Wrentz could establish a prima facie case of sex discrimination, USAble has presented a legitimate, nondiscriminatory reason for giving Wrentz a final written warning and reducing her bonus pay—her violation of USAble's COVID quarantine policy. The Eighth Circuit has "consistently held that violating a company policy is a legitimate, non-discriminatory rationale." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006). The reasonableness of the policy does not matter. *See Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 n.3 (8th Cir. 1985), *cert. denied*, 475 U.S. 1050 (1986) ("The wisdom of this particular policy is not an issue in this case. It is an employer's business prerogative to develop as many arbitrary, ridiculous and irrational rules as it sees fit. Our only concern is that the employer must apply its rules in an even-handed, non-discriminatory manner.").

Wrentz's inability to point to any other employee who was allowed to return to work within fourteen days of testing positive for COVID is fatal to her claim that USAble's nondiscriminatory reason for giving her the warning and reducing her bonus is pretextual. While reducing her bonus may have been harsh or unreasonable, "[d]ebate as to whether the disciplinary actions plaintiff received were warranted by the nature of the alleged misconduct

17

does not give rise to an inference of retaliation or discrimination, particularly where at the time plaintiff admitted the conduct for which the discipline was imposed." *Jackson v. Morrison Mgmt.*, No. 4:04-CV-1603-DJS, 2006 WL 680932, at *2 (E.D. Mo. Mar. 16, 2006); *see Walker v. AT&T Techs.*, 995 F.2d 846, 850 (8th Cir. 1993) (belief that a business's decision is "harsh or unreasonable" does not make that decision unlawful).

### *3. Retaliation*

Summary judgment is granted on Wrentz's retaliation claims because she has neither presented direct evidence nor created an inference of retaliation. *See Brown v. City of Jacksonville*, 711 F.3d 883, 892 (8th Cir. 2013) (retaliation claims under Title VII and ACRA governed by same standards).

a.      Direct Evidence

Wrentz has not shown direct evidence of retaliation because she has not provided "a specific link" between her complaint about the cartoon and her final written warning and subsequent bonus reduction. *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (citation omitted).

b.      Burden-Shifting Framework

Although she lacks direct evidence, Wrentz could still survive summary judgment by creating an inference of unlawful retaliation under the burden-shifting framework set forth in section III.A.2.b above.

Wrentz has failed to establish a prima facie case of retaliation because she has not provided a causal link between her complaint about the cartoon and her final written warning

18

and subsequent bonus reduction.  This is true because Wrentz has failed to present any evidence that Prickett was aware of the complaint that Wrentz made about the cartoon to Black.  *See Culton v. Mo. Dep't of Corr.*, 515 F.3d 828, 831 (8th Cir. 2008) (failure to present evidence that supervisor was aware of employee's protected activities is fatal to employee's retaliation claim).  Wrentz's argument that her team's history of prior complaints to USAble HR gives rise to the inference that USAble "could have assumed that Wrentz was the employee who had made a protected complaint of race discrimination" is too speculative to overcome summary judgment.  Wrentz MSJ Resp. 13; *see Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) ("speculation and conjecture are insufficient to defeat summary judgment").

Even if Wrentz could establish a prima facie case of retaliation, USAble has presented a legitimate, nondiscriminatory reason for her final written warning and subsequent bonus reduction, and Wrentz has failed to show that reason is pretextual for the reasons set forth in Section III.A.2.b above.

B.    <u>Kia Philip</u>

Summary judgment is granted on Philip's race discrimination, sex discrimination, and retaliation claims.

### *1. Race and Sex Discrimination*

Summary judgment is granted on Philip's race and sex discrimination claims because she has neither presented direct evidence nor created an inference of race or sex discrimination.  *See Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 902 (8th Cir.

2015) (race discrimination claims under Title VII and ACRA governed by same standards); *Bell*, 60 F.4th at 1203 (same for sex discrimination claims).

a.      Direct Evidence

Philip has provided no direct evidence of race or sex discrimination.  Indeed, Philip had no in-person interactions with Hottell after early 2020.  *See Ramlet*, 507 F.3d at 1152–53 (explaining that a four-month lapse between comments reflective of prejudice and the plaintiff employee's termination undercut a finding of direct evidence of discrimination). Moreover, nothing about Philip's workload "clearly points to the presence of an illegal motive." *Griffith*, 387 F.3d at 736.

b.      Burden-Shifting Framework

Although she lacks direct evidence, Philip could still survive summary judgment by creating an inference of unlawful race or sex discrimination under the burden-shifting framework described in Section III.A.2.b above.  Philip has failed to establish a prima facie case of race or sex discrimination for three reasons.

First, Philip has failed to show that she suffered an adverse employment action because the record shows that she voluntarily resigned rather than being constructively discharged.  The actions upon which Philip bases her race and sex discrimination claims fall short of establishing the objectively intolerable working conditions necessary to establish that she was constructively discharged.  Specifically, the substantial gap in time between Hottell's harassing conduct towards Philip between 2017 and 2019 and her resignation in 2022 demonstrates that Philip was not subject to intolerable working conditions.  *See Hubbard v.*

*Parker*, No. H-C-91-15, 1992 WL 503431, at *5 (E.D. Ark. Oct. 6, 1992) ("The time between the alleged harassment or incidents of intolerable behavior and the resignation is evidence of just how intolerable the behavior really was.  For that reason many courts have found no constructive discharge when there was a space of time between the incidents and the resignation ranging from a couple of weeks to several months.").  And, the fact that Philip alleges that she continued to witness Hottell harass others is inconsequential because "discrimination and harassment claims must be brought by the victims, not third parties." *Perez v. City of Batvia*, No. 98 C 8226, 2004 WL 2967153, at *12 (N.D. Ill. Nov. 23, 2004) (citing *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998)).  Indeed, a claim of "[c]onstructive discharge requires considerably more proof than an unpleasant and unprofessional environment."  *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002).

Second, Philip has failed to show that she suffered an adverse employment action because her workload was not an adverse employment action.  Specifically, the record shows that during Philip's employment: (1) she was usually only asked to perform the work set forth in her job description and she was not subjected to any material change in her job duties; (2) her work assisting the marketing department with the incentive trip project was voluntary and unprompted; (3) she consistently received raises and promotions; (4) she was never disciplined for her refusal to work with Hottell during her last few years of employment with USAble; and (5) her increased workload in early 2022 was temporary and based on staffing needs.  Based on the record, no reasonable fact finder could find that Philip was subjected to an increased workload that materially changed her duties so as to create an

21

adverse employment action. *Sellers v. Deere & Co.*, 791 F.3d 938, 944 (8th Cir. 2015). Rather, Philip was subjected to mere inconveniences without any decrease in title, salary, or benefits, which are insufficient to show an adverse employment action. *Cruzan v. Spec. Sch. Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002). Indeed, "[s]carce resources and increased workloads are familiar complaints in virtually every workplace and every industry, but they do not give rise to a discrimination claim under Title VII." *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007).

Third, Philip has identified no male or non-black employees who were treated more favorably than she was treated, much less any who were similarly situated. *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010) (affirming summary judgment in favor of employer where employee failed to identify a similarly situated coworker whom the employer treated more favorably). Although Philip believes that the work assigned to her was disproportionate because USAble believed it could take advantage of her due to her race and sex, this bald statement is merely her opinion and not proof. *See Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010) (blanket statements do not absolve a party from "meet[ing] proof with proof by showing a genuine issue as to a material fact") (citation omitted).

Even if Philip could establish a prima facie case of sex discrimination, USAble has presented legitimate, nondiscriminatory reasons for its actions. First, as supported by the record, Philip was usually only asked to perform duties within her job description. Philip Dep. Ex. 2. The fact that her job description was broad or demanding does not mean that it

was discriminatory. Indeed, "assigning additional work that is included in an individual's job description is not an adverse employment action." *Mendoza v. DeJoy*, No. 21-CV-00991-H-JLB, 2022 WL 18832234, at *6 (S.D. Cal. Dec. 20, 2022) (cleaned up). Second, USAble's temporary assignments of additional work to Philip due to the departure of two marketing employees in early 2022 were legitimate and nondiscriminatory and do not give rise to an inference of discrimination. *See Tisdell v. McDonough*, No. 21-3658, 2023 WL 2486083, at *3 (8th Cir. Mar. 14, 2023) (per curiam) (temporary work outside of job description and mandatory overtime due to staffing shortages insufficient to establish adverse employment action).

Finally, Philip has failed to show that USAble's reasons are pretextual. She admits that she does not know how much of the two former employees' duties were distributed to her versus other USAble employees. Philip has not shown that USAble's reasons have no basis in fact, and she has presented nothing upon which a reasonable fact finder could rely in determining that discriminatory intent motivated USAble's decisions. *Torgerson*, 643 F.3d at 1047.

Although Hottell's behavior and USAble's complacency may be disconcerting, Philip has failed, as a matter of law, to create an inference of unlawful race or sex discrimination. Courts are bound to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" in order "to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up). That is what

is being done here.

*2. Retaliation*

Summary judgment is granted on Philip's retaliation claims. Instead of responding substantively to USAble's motion for summary judgment, Philip moved to nonsuit. Although I fairly liberally grant motions to nonsuit, Philip's motion is denied because nothing in the record indicates that her case involves retaliation. Philip's failure to substantively respond to the motion is therefore considered a waiver of her response. *See Morrow v. United States*, 47 F.4th 700, 703–04 (8th Cir. 2022) (district court may dismiss action with prejudice in response to plaintiff's motion for dismissal without prejudice); *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

## IV. CONCLUSION

For the foregoing reasons, USAble's motions for summary judgment are granted, and the complaint of Wrentz and Philip is dismissed with prejudice.

IT IS SO ORDERED this 1st day of July, 2024.

_____
UNITED STATES DISTRICT JUDGE